UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

**United States of America**,

        *Plaintiff*,

v.                                 **Case No. 3:18-cr-006**
                                       **Judge Thomas M. Rose**

**James Robert Dakin Jr.,**

        *Defendant*.

---

### ENTRY AND ORDER DENYING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE (ECF 24 & 29).

---

Pending before the Court is Motion by Defendant James Robert Dakin Jr. for a Reduction of Sentence Under the Compassionate Release Provisions Pursuant to 18 U.S.C. 3582(c)(1)(A) and the First Step Act of 2018. (ECF 24). The government filed a response to the motion on August 4, 2020. (ECF25). After being appointed, defense counsel filed a Supplemental Motion for Compassionate Release. (ECF 29). The government again responded, (ECF 31), defense replied, (ECF 32), and the government sur-replied. (ECF 33).

**I.**     **Background**

On January 8, 2018, James Dakin walked into the Key Bank located at 5001 Chambersburg Road in Huber Heights, Ohio. (PSR at ¶ 12). Dakin approached the teller window and displayed

1

what appeared to be a black pistol. (Id.). Dakin ordered bank patrons to the ground and demanded money from the teller, advising the teller not to use dye packs or the teller would be shot. (Id.). The teller turned $4,100 in cash over to Dakin, at which time Dakin fled out the door, got into his car and drove away immediately. (Id. at ¶ 12-13).

Law enforcement responded to the bank, obtained the surveillance, and released images of Dakin to the public asking for help in solving the robbery. (Id. at ¶ 13-14). A tip from a credible source led to identifying Dakin. (Id. at ¶ 14). At the time Dakin committed the January 8, 2018 Key Bank robbery, Dakin was on supervised release for armed bank robbery. (Id. at ¶ 15).

On March 15, 2018, James Robert Dakin Jr. pled guilty to bank robbery in violation of 18 U.S.C. § 2113(a) and (d). His advisory sentencing guideline range was 63 to 78 months. The U.S. Probation Office's Presentence Investigation Report noted that Dakin had ACL reconstruction surgery in the 1990's with ongoing issues which may require knee replacement in the future. (Id. at ¶ 49). Dakin had not been receiving any medications except for cortisone shots every six months for his knee. (Id.). He was sentenced to 67 months of imprisonment.

Dakin is currently serving his sentence at FCI Coleman Medium in Sumterville, Florida. Dakin appears to have approximately 12 months of jail time credit. Dakin has a scheduled release date of August 24, 2024 but was ordered to serve 26 months consecutively for a supervised release violation from United States District Court for the Northern District of Ohio, Case Number 5:02-cr-343.

COVID-19 is a viral disease for which there is currently neither treatment, nor cure. It is highly infectious and particularly likely to spread among populations where individuals are incapable of remaining physically distant from one another. Among viral diseases, the mortality

rate for COVID-19 is high. According to the Centers for Disease Control and Prevention, via its public website on this issue (most recently revised October 1, 2020), those who might be at an increased risk for severe disease include people with Chronic Obstructive Pulmonary Disease (COPD) and obesity. See *People with Certain Medical Conditions* available at https://www.cdc.gov/coronavirus/2019-ncov/need-extraprecautions/people-with-medical-conditions.html

Public health experts have warned that incarcerated individuals "are at special risk of infection" and are "less able to participate in proactive measures to keep themselves safe." *Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States* (March 2, 2020), at https://bit.ly/2W9V6oS. The conditions in BOP facilities provide a hospitable environment for COVID-19 to spread. Joseph A. Bick, *Infection Control in Jails and Prisons*, CLINICAL INFECTIOUS DISEASES 45(8): 1047-1055 (2007), available at https://doi.org/10.1086/521910; Vice, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. is Failing Federal Inmates as Coronavirus Hits* (Mar. 24, 2020), available at https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federalinmates-as-coronavirus-hits.

As a result of these concerns, on May 18, 2020, the Department of Justice issued internal guidance which directs that the Government concede that Defendants who have certain CDC risk factors can establish "extraordinary and compelling reasons" that warrant a reduction in sentence. (See Government's Supplemental Response, *United States v. Albert M. Firebaugh IV*, No. 16-20341 (S.D. Fla June 1, 2020), ECF 43. While imprisoned, Dakin has been diagnosed as suffering

3

from COPD. In addition to is COPD, he also suffers from obesity and has high blood pressure, placing him in a higher risk category.

The CDC states that people with a BMI over 30 are at an increased risk from COVID-19. In his Florida Musculoskeletal Institute report, Dakin's BMI is reported as 36.5. He is 5'8" and weighs approximately 240 pounds. In addition to obesity, the medical records from December 11, 2019 note that he was diagnosed with High Blood Pressure. Dakin is also in extreme pain as a result of a "non-displaced right humeral head fracture and non-displaced lateral tibial plateau fracture." Dakin also has an enlarged prostate and urinary tract symptoms.

Each of these conditions make Dakin more likely than the average person to become gravely ill or die as a result of contracting COVID-19. The CDC currently reports that 94% of people who die from COVID-19 had a previous health condition. Two of Dakin's prior existing health conditions (COPD and obesity), are specifically named by the CDC as increasing or potentially increasing the risk of a negative outcome from COVID-19 infection.

As of October 1, 2020, FCI Coleman Medium had 104 COVID-19 positive inmates and 34 additional staff members positive. As of January 27, 2021, those numbers have been reduced to 19 positive inmates, with 39 positive staff members. Three inmates have, unfortunately, perished from the disease, while 325 have recovered, as have nine staff members. Https://www.bop.gov/coronavirus/ (last visited January 26, 2021). The inmates at Coleman remain on lockdown.

The Court recognizes the danger of Dakin's proximity to COVID-19 and that the virus is active within FCI Coleman. It is extraordinarily difficult to combat the spread of COVID-19 within a prison, as both courts and the CDC have recognized. *United States v. Gardner*, No. 14-cr-20735-

4

001, 2020 U.S. Dist. LEXIS 129160, at *4–*5 (E.D. Mich. July 22, 2020). Even under otherwise ideal circumstances, prison conditions prevent the kind of physical distancing necessary to prevent the spread of this virus. Id. However, As of January 15, 2021, the BOP administered 17,189 doses of the vaccine. One dose has been administered to 7,576 staff and 5,457 inmates. A completed series of two doses have been administered to 1,027 staff and 1,051 inmates. https://www.bop.gov/resources/news/20210116_covid_vaccine_efforts_commended.jsp.

On May 15, 2020, Dakin (Inmate #47611-008) sent a request to the Warden for compassionate release. (ECF 24-1, PageID 80). On May 18, 2020, the Warden denied his request. (ECF 24-1, PageID 79). Dakin has now filed a motion with the Court seeking compassionate release, citing the risks posed by the COVID-19 pandemic. (ECF 24). In particular, Dakin claims that his "very high" blood pressure, prostate issues, injuries from a slip and fall, and COPD puts him at risk from COVID-19. (ECF 24, PageID 60-62). Dakin attached medical records documenting his injuries from the slip and fall as well as documentation of COPD. (ECF 24-1, PageID 63-78)

**II.     Analysis**

Movant asks the Court to grant him a reduction in sentence as permitted by 18 U.S.C. § 3582(c)(1)(A)(i) and to consider what he alleges are extraordinary and compelling reasons for doing so. Section 603(b) of the First Step Act, which was signed into law on December 21, 2018, modified 18 U.S.C. § 3582 to allow a defendant to bring a motion on his or her own behalf either "[1] after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or [2] the lapse of 30 days from the receipt of such request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C.

5

§ 3582(c)(1)(A); Pub L. No. 115-391, 132 Stat. 5194; *see also United States v. Alam*, 960 F.3d 831, 833-34 (6th Cir. 2020) ("If the Director of the Bureau of Prisons does not move for compassionate release, a prisoner may take his claim to court only by moving for it on his own behalf. To do that, he must fully exhaust all administrative rights to appeal with the prison or wait 30 days after his first request to the prison," and "[p]risoners who seek compassionate release have the option to take their claim to federal court within 30 days, no matter the appeals available to them") (internal quotation marks omitted) (alterations adopted).

A district court has limited authority to modify a sentence. "Generally speaking, once a court has imposed a sentence, it does not have the authority to change or modify that sentence unless such authority is expressly granted by statute." *United States v. Hammond*, 712 F.3d 333, 335 (6th Cir. 2013). Section 3582(c)(1)(A) grants such authority in certain limited circumstances. It provides in part:

> The court may not modify a term of imprisonment once it has been imposed except that—in any case—the court … may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C.] section 3553(a) to the extent that they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction … and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A)(i).

Thus, the Court can modify a term of imprisonment if it finds that (1) "extraordinary and compelling reasons warrant such a reduction," (2) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," and (3) such a reduction is appropriate "after considering the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A)(i); *see also United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir.

6

2020); *United States v. Spencer*, No. 20-3721, 2020 U.S. App. LEXIS 28051, at *4, 2020 WL 5498932 (6th Cir. Sept. 2, 2020).

While judges "have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13," *United States v. Jones*, No. 20-3701, – F.3d –, 2020 WL 6817488 at *9 (6th Cir. November 20, 2020), the Court references U.S.S.G. § 1B1.13 for guidance. Therein, the Sentencing Commission identifies four circumstances in which "extraordinary and compelling reasons" may exist. *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"). United States Sentencing Commission, Guidelines Manual, § 1B1.13, at cmt. n.1 (Nov. 1, 2018) (Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) (Policy Statement)). Those four circumstances are: (A) Medical Condition of the Defendant; (B) Age of the Defendant; (C) Family Circumstances; and (D) other extraordinary and compelling reasons. *Id.* Each of the four circumstances has its own parameters. *Id.* Commentary also confirms that, "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." *Id.* at cmt. n.3; *see also United States v. Keefer*, No. 19-4148, 2020 U.S. App. LEXIS 32723, at *6-7, 2020 WL 6112795 (6th Cir. Oct. 16, 2020) ("[i]n Application Note 1 to § 1B1.13, the Commission also listed the 'extraordinary and compelling reasons' that might entitle a defendant to a sentence reduction").

The policy statement also encourages the Court to consider whether the defendant is "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

7

*Id.*; *see also Kincaid*, 802 F. App'x at 188; *Spencer*, 2020 U.S. App. LEXIS 28051, at *4 ("[t]he district court must also find that the defendant is not a danger to the safety of any other person or to the community") (internal quotation marks omitted). Section 3142(g) provides factors to be considered in making that "danger to the safety" determination.

Specifically, 18 U.S.C. § 3142(g) states:

> (g) Factors to be considered. The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—
>
> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591 [18 USCS § 1591], a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of

8

>its source, will not reasonably assure the appearance of the person as required.

18 U.S.C. § 3142(g); *see also United States v. Jones*, No. 20-3748, 2020 U.S. App. LEXIS 32451, at *4-5 (6th Cir. Oct. 14, 2020).

The factors set forth in Section 3553(a) "include, among others, 'the nature and circumstances of the offense'; the defendant's 'history and characteristics'; the need for the sentence imposed to reflect the seriousness of the offense, provide just punishment, and afford adequate deterrence; and the need to avoid unwarranted sentencing disparities." *Jones*, 2020 U.S. App. LEXIS 32451, at *6 (quoting 18 U.S.C. § 3553(a)(1), (2), (6)).

Moreover, "compassionate release is discretionary, not mandatory." *United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020); *see also* 18 U.S.C. § 3582(c)(1)(A)(i) (stating that a court "may" reduce the term of imprisonment); *Keefer*, 2020 U.S. App. LEXIS 32723, at *7 ("The statute's plain text makes evident the discretionary nature of a compassionate-release decision," and "the statute lists factors that, when present, *permit* a district court to reduce a sentence") (emphasis in original).

The Bureau of Prisons has taken significant measures to protect inmates. On March 13, 2020, in accordance with its Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, BOP has repeatedly revised the Action Plan to address the crisis. Beginning November 25, 2020, BOP implemented Phase Nine of the Action Plan, which currently governs operations. https://sallyport.bop.gov/co/hsd/infectious disease/covid19/index.jsp. The current operations plan follows all national guidelines and requires that all inmates be secured in their assigned quarters for a period of at least 14 days in order to stop spread of the disease. Inmates are required to wear

9

masks at all times except eating and sleeping. Three washable cloth masks have been provided to each inmate. Only limited movement is afforded to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited movement of inmates and detainees among its facilities. Symptomatic inmates and asymptomatic inmates with a risk of exposure are placed in quarantine until cleared by medical staff. Social visits, where allowed, are non-contact. *See* [www.bop.gov/coronavirus/covid19_status.jsp](www.bop.gov/coronavirus/covid19_status.jsp). (Telephone minutes have been increased from 300 a month to 500, with no charge.)

In an effort to assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is also exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed BOP to prioritize transferring inmates to home confinement in appropriate circumstances when those inmates are vulnerable to COVID-19 under the CDC risk factors. A subsequent memorandum from the Attorney General on April 3, 2020 further directed BOP to expand the range of inmates eligible for home confinement, as authorized by the CARES Act. *See* Section 12003(b) (2) of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, enacted March 27, 2020. In assessing whether home confinement is appropriate for a particular inmate, BOP weighs numerous factors, including the inmate's medical conditions, age, crime of conviction, and conduct while in prison; conditions in the inmate's particular institution; availability of post-release transportation, housing and supervision for the inmate; and the inmate's risk from COVID-19 if released. Prior to releasing an inmate, BOP is directed to implement a fourteen-day quarantine in order to protect the community.

BOP asserts it is devoting all available resources to executing the Attorney General's

directives, and that it is systematically assessing the inmate population to determine which inmates are most appropriate for transfer. From the Attorney General's memo on March 26, 2020 until November 6, 2020, the BOP placed 7,766 inmates on home confinement. *See* www.BOP.gov/coronavirus (accessed November 6, 2020). By January 29, 2021, 7,837 were on home confinement; but counting those who had completed their home confinement, along with those currently on it, that number was 21,069. (id. accessed January 29, 2021).

BOP claims its home confinement program provides a centralized, consistent mechanism for identifying prisoners for whom home confinement is most appropriate. The Court hopes the resulting reduction in prison population will benefit all remaining prisoners. The Court hesitates to augment a systematic effort by granting compassionate release to prisoners who may be less deserving than others nationally, and without the capacity to conduct the comprehensive and consistent review that can be undertaken by BOP.

The Court may only reduce a sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) if, "after considering the factors set forth in § 3553(a) to the extent that they are applicable," the Court "finds that" "extraordinary and compelling reasons warrant such a reduction" "and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress directed that the Sentencing Commission adopt policies regarding "what should be considered extraordinary and compelling reasons for sentence reduction." 28 U.S.C. § 994(a)(2)(C) & (t). The Sentencing Commission fulfilled Congress's directive by issuing U.S.S.G. § 1B1.13. The policy statement provides for reduction of a sentence, after considering the § 3553(a) factors, if (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18

11

U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13.

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." U.S.S.G. § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. U.S.S.G. § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." U.S.S.G. § 1B1.13, cmt. n.1(D).

Because the Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include only certain specified categories of medical conditions, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. If a

12

defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion will be denied.

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall into either of those categories and therefore could not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the "[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). To classify COVID-19 without further extenuating circumstances as an extraordinary and compelling reason would be wrong and would be detrimental to B.O.P.'s organized and comprehensive anti-COVID-19 regimens.

That does not mean, however, that COVID-19 is irrelevant to a court's analysis of a motion under § 3582(c) (1) (A). If an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19, that condition may satisfy the standard of "extraordinary and compelling reasons." Under these circumstances, a chronic condition (i.e., one "from which [the defendant] is not expected to recover") reasonably could be found to be "serious" and to "substantially diminish[ ] the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19. U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)(I). But as part of its analysis of the totality of circumstances, the Court should consider whether the inmate is more likely to contract COVID-19 if he or she is released than if he or she remains incarcerated. That will typically depend on the inmate's proposed

13

release plans and whether a known outbreak has occurred at his or her institution.

Dakin was convicted for a violent crime that made use of a firearm while he was on supervised release for the same crime. Dakin did accept responsibility for the offense. He also "assisted authorities in the investigation or prosecution" of his own "misconduct by timely notifying authorities of the intention to enter a plea of guilty." During his incarceration for this offense, Dakin reports that he has no incident reports for disciplinary infractions. In August of 2019 Dakin also received a Certificate of Appreciation for his contributions to the GED students at Coleman. He continues to tutor GED students. In July of 2019 he also received a Certificate of Completion after completing a Commercial Driver's License continuing education class. Dakin cannot currently raise his arm above his shoulder and he has two broken bones in his leg. He is in a constant state of pain as a result of the fractures in his legs. The education, training and treatment Dakin has received while incarcerated do demonstrate that he is a diminished threat to the community. See 18 § U.S.C. 3142(g) and U.S.S.G. § 1B1.13(2).

Dakin has proposed a release plan. He plans on living with his sister in Vandalia, Ohio. In addition to his sister, Dakin also has the support of friends Keith Hensley and Keith's father, Jack Hensley. Both have written letters of support for Dakin and have communicated their intent to help with Dakin's transition in the event he is released.

However, according to his PSR, Dakin advised Probation that he "no longer has a stable residence or a support system" when discussing that address in Huber Heights and its occupants. (PSR at ¶ 47). Thus, Dakin's sister and friend have not been a permanent fixture in his life, diminishing their reliability in providing him a support system. Furthermore, Dakin advised Probation that "he needs placement into a halfway house upon his future release from prison."

14

(Id.). As for the Florida address provided in Dakin's motion, Dakin does not give specific information about how many people live at that residence or if there are any others in that residence who are in a high risk population for COVID-19 (for instance if they work in the medical field or as first responders) who would pose a risk to Dakin

The need for the sentence imposed to "provide the defendant with…medical care…in the most effective manner," 18 U.S.C. § 3553(a)(2)(D), weighs in favor of granting this motion to reduce the sentence. The spread of COVID-19 at FCI Coleman, combined with Dakin's significant health risks, alters the balance of the need for the sentence to provide him with medical care in the most effective manner. See *United States v. Williams-Bethea*, No. 18-cr-78, 2020 U.S. Dist. LEXIS 96651, at *10–*11 (S.D.N.Y. June 2, 2020); *United States v. Rodriguez*, No. 2:03-cr00271, 2020 U.S. Dist. LEXIS 58718, at *32 (E.D. Pa. Apr. 1, 2020).

However, factors in §§ 3553(a)(2)(A), (B) and (a)(6) counsel against reducing the sentence under these circumstances. First, Dakin has only been in custody since January 17, 2018 and his current projected release date is not until August of 2024. However, courts have the discretion to impose a condition of home confinement to match the remaining term of the custodial component of the sentence, if that court believes that is appropriate to achieve sentencing goals. The requested reduction is due solely to the combination of COVID-19 at FCI Coleman and Dakin's medical issues.

The time Dakin has served in prison has achieved only a little of the original sentence's retributive, deterrent, and incapacitate purpose. While Defendant's continued detention now poses danger of serious injury and death, the Court cannot say it is a risk grossly disproportionate to Dakin's conduct of conviction. *Cf. Williams-Bethea*, 2020 U.S. Dist. LEXIS 96651, at *12.

15

Because of the seriousness of the offense, and because it would present a risk to the public, compassionate release is not warranted here.

Even when a defendant is able to demonstrate a potentially "extraordinary and compelling reason," compassionate release is not necessarily appropriate. Under the applicable policy statement, the Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2). Additionally, the Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020). Here, "the nature and circumstances" of Defendant's crime weighs against relief at this point. 18 U.S.C. § 3553(a)(1).

Dakin's crime weighs against relief. 18 U.S.C. § 3553(a)(1). Dakin was convicted of bank robbery, which he committed while brandishing a BB gun that looked like a real gun. While brandishing what looked like a black pistol, Dakin ordered bank patrons to the ground, demanded money from the teller, and advised the teller not to use dye packs or he would shoot the teller. After receiving the money, he fled out the door to his vehicle and drove out of the lot.

At the time Dakin committed this offense, he was on supervised release out of the Northern District of Ohio for armed bank robbery. Thus, Dakin was on supervision for an armed bank robbery crime when he committed a similar offense.

Dakin's "history and characteristics" likewise do not support relief. 18 U.S.C. § 3553(a)(1). Similar to the instant offense, Dakin has a prior conviction for Armed Bank Robbery and Using a Firearm to Commit a Crime of Violence in the Northern District of Ohio, Case Number 5:02-cr-343, for which he received 171 months confinement. (PSR at ¶ 35). His supervised release was

16

revoked in 2017 and subsequently to obtaining this present conviction. Dakin has a conviction for Having Weapons while under Disability in the Richland County Common Pleas Court, Case Number 15CR1040. (Id. at ¶ 36). He received an 18-month prison sentence for that offense. (Id.). Dakin also has a theft conviction in the Montgomery County Common Pleas Court, Case Number 91CR2083. (Id. at ¶ 34).

The need for the sentence to reflect the seriousness of the offense, afford adequate deterrence, and protect the public similarly cuts against relief. See 18 U.S.C. § 3553(a)(2). Considering these factors, this Court sentenced Dakin to a 67-month term of imprisonment. He was subsequently sentenced to 24 months for his supervised release violation. To date, he has served approximately 20 months of the sentence on this case. Reduction of Dakin's sentence would thus fail to fully address these purposes of sentencing. In view of the § 3553 sentencing factors, compassionate release would be improper here. See § 3582(c)(1)(A). For the same reasons, based on his criminal history and offense conduct, Dakin cannot show that he "is not a danger to the safety of any other person or to the community," USSG § 1B1.13(2), which independently precludes relief.

In view of the § 3553 sentencing factors, compassionate release is improper here. *See* § 3582(c)(1)(A).

### III. CONCLUSION

Movant does not meet the requirements necessary to be granted relief under 18 U.S.C. § 3582(c)(1)(A). Thus, the Court **DENIES** Motion for a Reduction of Sentence Under the Compassionate Release Provisions Pursuant to 18 U.S.C. 3582(c)(1)(A), and the First Step Act of 2018. ECF 24, 29.

**DONE** and **ORDERED** in Dayton, Ohio on Friday, February 5, 2021.

s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE